## No. 13,917.

### CHARLES LANGE vs. ILLINOIS CENTRAL RAILROAD COMPANY.

#### SYLLABUS.

1. It is a general rule that a person who by his fault causes damages to another, whether by his act, or by his negligence, his imprudence or want of skill, is obliged to repair it.

2. Citizens are protected by the Constitution from warrants of arrest for crime issued against them, without probable cause, and they are entitled to recover damages from parties causing such warrants to issue. It is not necessary for such recovery that the arrest should have been actuated by malice, in the sense of personal ill-will towards, or desire to injure the party charged. The absence of such malice only affects the character and *quantum* of damages.

3. Advice of counsel in certain cases under certain circumstances gives a qualified protection to their clients in cases of *torts*, but not to the extent of enabling them to escape liability, though client and counsel are negligent or indifferent to consequences.

APPEAL from the Civil District Court, Parish of Orleans— *King*, J.

*Cage, Baldwin & Crabites,* for Plaintiff, Appellee.

*Hunter C. Leake* and *Gustave Lemle* (*J. M. Dickinson,* of counsel), for Defendant, Appellant.

### STATEMENT OF THE CASE.

NICHOLLS, C. J.   Plaintiff's prayer in this action was that he have judgment against the defendant for ten thousand and fifty dollars, with legal interest.

The issues were tried by a jury. It returned a verdict in favor of plaintiff for fifteen hundred and fifty dollars. A judgment was rendered by the court in conformity with it, after a new trial applied for by the defendant was refused. The latter appealed. The grounds upon which the plaintiff's demand was founded were set forth in his petition, as follows:

That one J. W. Cassidy, an officer, servant, agent and employee of the company, at the instance, request, direction and instigation of the defendant did, on the 20th day of August, 1897, appear before the recorder of the First Recorder's Court of the City of New Orleans, a court having full jurisdiction, as authorized by law, to receive complaints, and upon verification thereof under oath to order arrests, commitments, bail, etc., and then and there acting in his said capacity, as servant and employee of said corporation, and in the exercise of the functions in which he was employed, and under instructions therefrom, made complaint against petitioner in the form of a sworn affidavit, charging petitioner as follows:

"That on the 20th day of August, 1897, between 11 and 12 o'clock P. M., at 1217 South Peter street, between Thalia and Erato, in this district and city, one Charles Lange did then and there wilfully and feloniously have in his possession two brass journals, valued at about four dollars ($4.00) in United States currency, and the property of the Illinois Central Railroad, well knowing same to be stolen, in violation of Section eight hundred and thirty-two (832) of the Revised Statutes of Louisiana," and praying that petitioner be arrested and dealt with according to law.

That upon said affidavit the said recorder issued his warrant for the

arrest of petitioner, and upon said warrant petitioner was arrested on August 21st, 1897, by an officer of said First Recorder's Court, and taken before said recorder, and was then arraigned and held under bail for his further appearance for trial before said recorder on the 8th day of September, 1897.

That on said 8th day of September, 1897, petitioner appeared before said recorder then regularly holding his court, according to law, and the said Illinois Central Railroad Company appeared thereat through counsel and employees, and said counsel applied to the court for a continuance which was granted, and the matter fixed for the 24th day of September, 1897.

That on the said 24th day of September, 1897, petitioner appeared before the said recorder, then regularly holding his court, according to law, and that said defendant attended said trial with counsel, having summoned numerous witnesses, and directed and conducted the prosecution of petitioner upon said affidavit, and after full, fair and perfect trial, petitioner was found not guilty of the offense charged, and was discharged by said recorder, and the said criminal proceeding was then and there finally terminated by the acquittal and discharge of petitioner, and has in no manner been renewed.

That the said charge so made by said Illinois Central Railroad Company, through its said employee, was wholly false and unfounded to the knowledge of defendant, its agents, attorneys and employees, and that the said defendant, its servants, agents and employees, made said charge and caused the arrest, imprisonment and prosecution of petitioner maliciously and without probable cause.

That the said defendant, its agents, servants and employees, in making said charge, acted maliciously, recklessly, carelessly, without probable cause, and in utter disregard of petitioner's rights, and with total indifference to all consequences; that the slightest and most casual and most evidently suggested inquiry and investigation would have shown them that whatever suspicions they might have entertained, if any, that petitioner was guilty of the offense charged, were totally unfounded.

That the said defendant corporation and its said agents and employees moved thereto by bad motives, malice, and recklessness and disregard of social duties and of the rights of petitioner, as a man, a citizen and a member of society, made no investigation whatsoever of

the facts of this case, but made the affidavit herein utterly regardless of petitioner's rights and for their own sinister ends.

That after the making of said affidavit and the institution of said malicious prosecution, the said defendant, through its attorneys, servants, agents and employees, was made fully aware of all the facts tending to show petitioner's absolute innocence of the charge preferred against him, and whatever vague, reckless and unfounded suspicions they may have had at the time of making said affidavit, if any, were, or ought to have been, thereby dispelled, but, nevertheless, the said defendant corporation, its attorneys, servants and employees, persisted in their unfounded, illegal and malicious prosecution of petitioner.

That up to the time that this prosecution was instituted against him, he had never been charged with a criminal offense, and he had always borne a good reputation among those who knew him in this community in which he had always lived.

That by reason of said malicious and unfounded criminal prosecution by the said defendant, its attorneys, servants and employees, he incurred damages to the amount of fifty dollars ($50.00) expended in attorney's fees in defending said prosecution.

That by reason of said malicious and unfounded criminal prosecution, which was widely published to the world, he has suffered loss of reputation, insult, shame, humiliation and anxiety of mind, and has been damaged thereby in the sum of five thousand dollars.

That by reason of the malice, bad motives, wantonness, negligence, recklessness, oppression and careless disregard for another's rights, shown by the defendant, its attorneys, servants, agents and employees, in this malicious and unfounded prosecution, petitioner has been damaged in the further sum of five thousand dollars and is entitled to a further decree in the said sum of five thousand dollars as exemplary and punitory damages.

Defendant answered. It first pleaded the general issue. Further answering it averred that the affidavit made by Cassidy against the said plaintiff in the First Recorder's Court, was made under the advice and pursuant to the instructions of this defendant's former attorney and counsel, learned in the law after a full investigation of the facts and a full and fair statement of such facts to said attorney and upon the legal advice of said attorney.

That in directing said affidavit to be made, this defendant and its said servants, and its said attorney, acted in good faith without malice and upon probable cause.

That among other facts reported to this defendant's said attorney, before the making of said affidavit, was the fact that a fresh journal brass, bearing in prominent letters the name of this defendant cast into said brass in the manufacture, and being covered with fresh oil or lubricant, indicating its recent use in some railroad car belonging to defendant, was found in the possession of said plaintiff at his place of business among sundry other railroad brasses, bearing the stamp of other railroad companies, some of them being connecting lines of this defendant, which fact was established upon the trial of said Lange.

That it was also stated as a fact to this defendant's said attorney before the making of said affidavit that none of the trunk lines of railway terminating in the city of New Orleans sold railroad journal brasses to junk dealers or others in the city of New Orleans, which said general custom the said plaintiff admitted to be the fact, and the same was otherwise proved before said recorder upon the trial of said plaintiff.

That it was further stated as a fact to this defendant's attorney, before the making of said affidavit against said plaintiff, that shortly prior to the making of said affidavit a number of journal brasses had been stolen from this defendant's cars and from cars belonging to other railroad companies connecting with defendant, and in defendant's possession as carrier, in the city of New Orleans, between the time said cars arrived at its government yard, and were inspected, and the time said cars reached its levee yards, where they were again inspected, all of which was shown and proven upon said trial to be true.

That it was further stated as a fact to said attorney, before the making of said charge, that upon one occasion the said plaintiff had bought a certain baby carriage from a small negro boy for twenty-five cents, after said carriage had been stolen from its rightful owner. Which said fact was also shown to be true upon the trial of said plaintiff upon said charge.

In view of the premises defendant prays that having fully justified in this behalf, this defendant be hence dismissed with costs.

The plaintiff is in the junk business in the city of New Orleans and has been for over twenty years. His reputation is good. In the latter

part of 1896, E. J. Brown, representing that he was an agent of the Armour Packing Company, a company running its own cars on different railroads, called at plaintiff's store and offered to sell hm a number of car brasses which were then at one of the buildings of the Northeastern Railroad Company. Plaintiff told him he would call there the next morning, and he did so. Meeting with the master mechanic of that road he was told by him in answer to inquiries that Brown had the right to sell the brasses; that they belonged to the Armour Packing Company. He told the master mechanic that he would buy them and that he would send his wagon for them, and this he did. The brasses were taken to the store and there weighed, and plaintiff gave his check for the same to Brown. When received they were placed in a pile upon the floor of the room in which plaintiff held his office, and there remained up to the time of the occurrence which gave rise to this litigation. They were fully exposed to the view of any one entering the office.

In the summer of 1897 there were numerous thefts of car brasses, or journals, in New Orleans. To such an extent was this carried at that time that the newspapers of the city commented upon it a number of times. On the 20th of August, J. W. Cassidy, a detective or special officer of the defendant company, made an affidavit before one of the recorders of New Orleans, charging the plaintiff with wilfully and feloniously having in his possession two brass journals, valued at $4.00, the property of the Illinois Central Railroad Company.

Before making this affidavit, Cassidy had gone to the plaintiff's store in company with one Donnelly, also a special officer or watchman of the defendant, and there met plaintiff's son, a young man of about eighteen, and an old man, one of plaintiff's employees. Plaintiff was absent at the time Donnelly and Cassidy went to Lange's store, at the suggestion of Sergeant Creigh of the police force. Cassidy was under Donnelly's orders. When examined, later as a witness before the recorder, Cassidy testified that he and Donnelly went together to Lange's store, that they had taken a piece of paper and wiped off the names upon the different brasses and found these two brasses among others. That the brasses were in the office on the floor; they had no trouble in finding or seeing them; they were not covered up; they were full of dust and full of grease. Mr. Lange himself was not in

the store at the time. They met Lange's son and an old man there. Donnelly asked the latter to see the brasses and he showed them where they were. He asked him where Lange got the brasses and he said he had a receipt for the brasses from the Northeastern road; he asked to see the receipt, but they did not see it. They did not go back to see Mr. Lange at all, nor did they attempt to find out how long those brasses had been in the shop.

Donnelly left to get an inspector from the defendant company to go to Lange's. An inspector named Stretzinger came in later while Cassidy was there, but Donnelly was away at the time. The brasses were put in the inspector's care and taken off. He (Cassidy) made the affidavit. Donnelly asked him to make it, nobody else asked him; there was no conversation between himself and Stetzinger about the affidavit. He made the affidavit on the 20th of August, the same day he was at the shop.

When Donnelly was examined at a witness, before the recorder, he testified that he had not seen Lange on the occasion of his visit to the shop. He saw his son there and an old man. He did not see Lange at all, could not see him, asked his son and the old man for him several times, they did not tell him where he was; he did not ask them to tell Lange that he had been there to see him and ask him to call on him; he did not ask for any explanation as to why those brasses were there; neither he nor any one with him asked any one how those brasses got into there; he was positive of that; they asked if they had any brasses and they said "Yes;" that was all they asked. The brasses were in the shop; they were not concealed; they were in a pile on top of one another. If a person went into the office and looked around he could see them, but not from outside. The affidavit was made by Cassidy by his instructions. Being asked the question whether the particular brasses belonged to the Illinois Central Railroad, he answered that they were at one time its property; that they had the stencil mark of the Illinois Central, and should be the property of the company. The following questions were asked and answered:

Q. Then, any brasses that you see in the shop of a man with the I. C. mark upon them, you think that is sufficient evidence for you to arrest that man and charge him with a felony, do you?

A. Yes.

Q.   Are those your instructions?

A.   Those are instructions from our attorney.

Q.   Those are your instructions?

A.   From our attorney.

Q.   When you made this affidavit, were you acting under instructions?

A.   Yes, sir.

Q.   From the railroad?

A.   Yes, sir.

The car inspector, who has been referred to, went to Lange's store for the purpose of examining the brasses or journals. They were two of fifty brasses which were, as stated, in a pile on the floor of the office. He made no inquiries as to how Lange had come into possession of them, nor for what length of time he had held them. The record does not show any conferences between him and either Donnelly or Cassidy, the counsel of the defendant or the defendant company. Lange's son made out and gave to him a list of all the brasses his father had and delivered to him these two particular journals.

Counsel of the defendant testified that he conducted the proceedings before the recorder; that he was consulted by Donnelly and by his assistant Cassidy. There was no substantial difference between the statements made by them to him and those which they made before the recorder. He advised the making of an affidavit against the defendant charging him with having stolen property in his possession belonging to the defendant. He understood the affidavit was made on his advice. It was a rule of the company for its special officers, except where parties were detected in the very commission of a crime, to report the state of facts to the company's attorney, and to make a charge only after his advice was given. The first notice he had of this special case was from Donnelly, not Cassidy. He could not remember distinctly whether the statement to him was made the day the brasses were taken from Lange's or not; he must have investigated the matter for several hours; he had as full a statement as he could get from Donnelly and Cassidy; he was told this: That there had been discovered in Mr. Lange's junk shop, near the Illinois Central terminal, at the foot of St. Joseph street, in that district, within a very few hundred feet of the company's tracks and terminus, several brasses of the company which were bright and new with the oil fresh upon them; that it was

not the custom of the company to sell its brasses or allow them to be sold in the City of New Orleans, or anywhere on the southern lines; that this was also the custom of all other railroads that had a terminal in New Orleans; that he could not remember whether he was told in what part of the shop the brasses were found, nor whether they were piled up nor how many brasses there were in the pile. He did not remember the details with certainty, but he did distinctly remember that at the time the statement was made, the further statement was made that a negro (Jerry White), who was in Mr. Lange's employ, had been convicted of stealing brasses from the New Orleans and Northeastern Railroad Company. That White had worked the most of his life in Mr. Lange's shop and drove his wagon. He was told that fact. He acted first upon the circumstance of finding new brasses with the company's stencil on them at Mr. Lange's place. He was told they were new; he had to take the statements made by his clients as every lawyer did; he did not see the brasses at that time. Donnelly and Cassidy were not his clients, but the servants of his client; they were his subordinates in the sense of their being the servants of his client; they were under him because they were bound to act under his instructions and to be guided by his advice; they belonged to an entirely different department of the company; he could not remember as an exact fact that these men had informed him that the brasses were piled up in the front office of Lange's store; he was satisfied that he did not know that the brasses were publicly exposed in Lange's shop so that anybody going along the street could see them; he did ascertain the place in the store where the brasses were, but his present recollection was that the pile of brasses was covered up by something. He was also told that the junk dealers (Lange included) were all aware of the fact that the trunk lines of railroads in New Orleans did not allow their brasses to be sold here. He was told that brass stealing from the railroads had been going on extensively all over the city, and had been commented on in the newspapers; he did not send to enquire of Lange how he had those brasses in his possession. He supposed one reason for having the affidavit made at once, was that the brasses would be got out of the way and the evidence lost. If the brasses had been taken from Lange's before the affidavit was made the fact must have been told him by Donnelly. The arrest was made partly from fear of the disappearance of the evidence, and partly

from his positive, honest, and sincere belief in Lange's guilt; he fully believed from the statements made to him that not only the brasses of the Illinois Central Railroad Company were stolen property in Lange's possession, but that the other brasses to which that company laid no claim was also stolen property, and he desired that the evidence should be found in his possession and recovered as soon as possible. He believed there was no reason for making further investigation; he had fully made up his mind. He was not informed that the Northeastern Railroad Company had investigated the matter, so far as it was concerned, and refused to take any action. After the affidavit was made, he had a conversation with Captain Day of the police force. He tried to impress upon him he had no case against Lange. Day told him that Lange had informed upon Jerry White and he did not think it was good policy to prosecute a man who had informed the police of a theft, and he asked him not to prosecute Lange, but he told him it was his duty to do so. He persisted in the prosecution in spite of Captain Day's request, because he believed then, and still believed, that Lange was guilty and acquired the brasses with knowledge that they were stolen property. He was satisfied at the time the case was before the recorder of the complicity of one of the witnesses (an employee of the Northeastern Railroad Company) with Lange. He knew nothing about Brown or any claim by Lange that he had ever bought any brasses from the Armour Packing Company, or from Brown at the time the prosecution was set on foot. He learned this for the first time on the trial or during one of the continuances, when an affidavit was produced from a man named Brown in Chicago. He objected to the introduction of this affidavit. He was aware of the custom among railroads hauling the cars of another company for the train crew, when the brass journals became heated or spoiled and worn out, to remove the brass with the stamp of the company thereon and replace it with one of their own, and to charge the other company with the price of that brass and that company pays for it, the new brass becoming the property of the company in whose car it is placed, and the worn out brass taken from the car becomes the property of the company which takes it out. He knew of the observance of that custom among the railroad companies in New Orleans at the time the affidavit was made, and he had that custom in mind when he advised it. He knew that any given brass of the Illinois Central Railroad

Company, which was taken out of a car wheel when the car was in the custody and control of another company, on account of its defective condition, might be replaced by some other brass. He knew, though not as an actual fact, that brasses containing the stamp of the Illinois Central Railroad Company might be held by other companies.

The charge. made against Lange in the affidavit referred to was, after several continuances, tried and examined into by the recorder, and he, after a full hearing of evidence, discharged the accused. The charge was not renewed and this suit followed.

## OPINION.

The defense made in this case is that the defendant company acted in the matter of making the charge against the plaintiff contained in Cassidy's affidavit, without malice, upon probable cause and upon advice of counsel. The facts and the circumstances connected with the affidavit and charge were not only placed before the recorder when the charge was investigated, but the entire testimony taken before him, together with additional evidence, was also submitted to the jury which tried the present action. The jury returned a verdict in favor of plaintiff, under a charge of the court, which was very favorable to the defendant.

We are satisfied, as a fact under the evidence, that the plaintiff, Lange, was not guilty of the charge laid against him in the affidavit and that he purchased the brass in good faith from Brown. There was no evidence to show that the brasses had been in fact stolen, and none indicating that Lange would have had reason to know that they were stolen, had such been the fact. The brasses were not entirely new. They had been used, and their condition was such as might well have authorized their removal from a car to which they were attached on some particular occasion by a train crew of the railroad company which had control of that car at that particular time on its own road. If this was the fact the brasses removed would, under the custom of interchange shown to have existed between railroad companies, become the property of the company which removed the same and subject to sale by that company as old brass or scrap.

It would not follow at all because brasses of the Illinois Central Railroad Company, with its mark upon them, should be found in a junk shop in New Orleans, and because under a rule of that company

it did not sell its own old brasses in New Orleans, but sent them to be melted at McComb City, that, therefore, they were stolen property. It was shown that the plaintiff was in no manner responsible for the actions of the negro Jerry White, in whose possession it would seem stolen brasses had been found on some occasion, and who confessed, or who was convicted, of having stolen them or received them knowing them to be stolen. This negro at one time, but long before this, had been in Lange's employ, but he was no longer with him, and so far from being identified or connected with White's guilt it was through information received from the plaintiff that White was arrested and convicted. Counsel of the company was informed of this fact before the charge was investigated before the recorder and was told by Captain Day of the police force that there was no case against the plaintiff, but the charge was, nevertheless, forced to trial. We are satisfied that the special officers of the defendant company who had charge of this matter were so anxious to protect its property from theft that they lost sight of the rights of others, which it was equally their duty to recognize and not infringe upon. We are satisfied that not only were they guilty of gross negligence in acting as they did, without availing themselves of means of information directly within their reach, but that the information which they did have was not communicated to counsel.

The brasses were not concealed. They were uncovered in a pile upon the floor of plaintiff's shop into which the public had free access. Lange was absent when they went to his store, but they were informed by his son that he had bought them and had a receipt for same. The son made no objection to delivering and did deliver at once, and before the affidavit was made, these particular brasses to the employee of defendant company who had been sent to examine them, and besides this he made out and gave to him a list of all the brasses in the store. Everything indicated a willingness to submit to full investigation. Instead of giving the plaintiff the opportunity to explain the situation, to which he was entitled under the circumstances of the case, these officers immediately filed an affidavit against him charging him with crime.

Our Civil Code, in Articles 2315 and 2316, declare that every act of man that causes damage to another obliges him, by whose fault it happened, to repair it; that every person is responsible for the damage

he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill.

Under the express terms of the law, any damage which is occasioned by one person to another renders the latter responsible for the same, whether it result from an act, from negligence, from imprudence, or want of skill, whenever the occasioning act rises to the point of being a "fault," unless there be some provision in the law withdrawing some particular case or class of cases from the operation of this rule.

We have, therefore, to examine each case upon its own special state of facts.

As far back as the case of Miller vs. Holstein (16 La. 389), this court said in a libel case that our courts were not bound by the technical rules of the common law, though, whenever our own law is silent, they may resort to a foreign system for a rule if consistent with reason and equity; that it was not prepared to adopt the common law distinction between words actionable in themselves and words which are not, and to decide that one cannot recover unless charged with an indictable offense without proof of special damage; that such a doctrine was not supported by Article 2294 C. C. (now Article 2315), which embraces all injurious words.

This declaration has been repeated a number of times since.

In Wells vs. Johnston, Sheriff, 52 Ann. 723, we said: "While our Code, in dealing with offenses and *quasi*-offenses, has used very general language and has not attempted to fix or classify faults by Article 2315 of the Code, our courts have constantly recognized that what might be regarded as legally a fault under one set of circumstances, would not be so under another, and that acts done by a person holding certain relations or capacities might be perfectly justifiable, which, if done by another in a different capacity, or holding a different relation, would be attended by penalties, and they have denied, narrowed or broadened, relief as different cases were presented in which a fault was charged according to known and fixed rules."

That case was one in which damages were claimed of the Sheriff of Ouachita Parish by a citizen of that parish for having arrested and confined him in prison on a charge of having committed a crime in Alabama without holding in his hands at the time a warrant for his arrest.

It was claimed by the defense that the sheriff had acted without malice in the line of his official duty, and that, as a condition precedent to recovery, plaintiff should establish, he had acted both maliciously and without probable cause; that the case was controlled by the rules governing cases of malicious prosecution.

We held in that case that it was not necessary that the plaintiff should have shown "malice" on the part of the sheriff; that there was no reasonable ground for having summarily arrested and imprisoned the plaintiff upon the mere suspicion which the sheriff entertained as to the identity of the plaintiff. The court said: "We have no reason to suppose the sheriff acted in this matter maliciously, that is, with the intention of injuring the plaintiff. We do think, however, that he acted without legal authority and in utter disregard of plaintiff's personal rights, though, under a mistaken idea as to what those rights were, and as to how far his own authority extended. Plaintiff cannot be made to suffer by defendant's misconceptions on that subject.

In dealing with the subject of charges of crime made by one private individual against another in a proceeding inaugurated before a recorder, we recognize fully, as was said in DeArmant vs. St. Amant (40 Ann. 375), that "it is not only the lawful right, but the civil duty of every citizen to set on foot criminal proceedings whenever he believes honestly, and on reasonable grounds, that a crime has been committed. The social interests require and the law invites him thus to aid the State in the discovery and punishment of crime, and it would be equally unjust and impolitic to make him a guarantor of the success of the prosecution as to make its failure an actionable wrong," but on the other hand, Article 7 of the Constitution declares to us that the right of the people to be secure in their persons, papers and effects, against unreasonable searches and seizures, shall not be violated, and *no warrant shall issue except upon probable cause* supported by oath or affirmation, and particularly describing persons or things to be seized," while Article 5 declares that "all courts shall be open and every person for injury done to him in his rights, lands, goods, *person* or *reputation,* shall have adequate remedy by due process of law and justice, and justice administered without denial, partiality or unreasonable delay."

It is our bounden duty, while seeking to uphold and vindicate the laws of the State, to see that we do not sacrifice to those interests of

the public the personal constitutional rights of the citizens. It will be seen that however flexible a definition may be given to the word *malice,* and how muchsoever the General Assembly may require the presence of *malice* in any particular act to be a necessary factor and condition precedent to a right of action, based upon that act as a fault, the absence of malice in a particular instance can never be invoked as a defense where the action is predicated upon injury done to person or reputation by a warrant issued upon the oath or affirmation of a party, but without the existence of probable cause. The existence of probable cause may protect a person even though he be acting from malice, but the converse of this proposition is not true. The absence of malice in a particular case where a warrant has been issued without *probable* cause may lessen the relief given to the plaintiff and exclude the infliction of "vindictive" or exemplary damages upon the person making the charge, but it will not justify courts in refusing to grant compensatory damages. To those damages plaintiff is entitled by force of the Constitution itself. Defendant urges in bar of this action that it acted in the premises upon advice of counsel.

Advice of counsel unquestionably gives in certain cases, and under certain circumstances, a qualified protection to the client, but we are not prepared to extend this doctrine to the point claimed by the defendant. Altering a little our language in Anderson vs. Elder, 105 La. 676, we say that to do this would have the effect, if strictly followed, of limiting the responsibility of the client to an extent which would enable him to escape liability though he and his counsel were negligent or grossly indifferent. (Nelson vs. Railroad Co., 49 Ann. 492; Wimbush vs. Hamilton, 45 Ann. 1190.)

We cannot in this case, with any justice or propriety, relieve the plaintiff from all liability by reason of advice of counsel. We consider it solely in mitigation of damages.

The courts of our State are not places from which, as from places of secure refuge, parties can with impunity perpetrate wrong. (Wimbush vs. Hamilton, 45 Ann. 1190.) We are of the opinion that the charge made against the plaintiff was without probable cause; that defendant's special officers were guilty of gross and inexcusable negligence in not ascertaining the facts of the case before making their report to defendant's counsel, and in not stating to him at the time

they made their report the facts which they knew, which would or should have influenced his course in the premises. That they acted with inexcusable indifference to plaintiff's rights, and that the defendant is responsible in compensatory damages for their action. The plaintiff was never placed actually in arrest, but he was constructively in arrest. Being informed that an affidavit had been made against him, he went of his own accord to the recorder's office, and was at once released on bond. He remained under bond until discharged. He was necessarily subjected to humiliation and mortification by reason of being placed unjustifiably before the public as a receiver of stolen goods.

We think the judgment appealed from is far too large an amount. For the reasons herein assigned the amount of the judgment is hereby reduced to one thousand dollars, and as so amended it is hereby affirmed. Costs of appeal to be borne by appellee.

Rehearing refused.